MORRIS LAW GROUP
Steve Morris, Bar No. 1543
Rosa Solis-Rainey, Bar No. 7921
411 E. Bonneville Ave., Ste. 360
Las Vegas, Nevada 89101
Telephone: (702) 474-9400
Facsimile:   (702) 474-9422
Email: sm@morrislawgroup.com
Email: rsr@morrislawgroup.com

Attorneys for Defendant, McKesson Corporation

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

CITY OF RENO,

Plaintiff,

PURDUE PHARMA, L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC. d/b/a THE PURDUE FREDERICK COMPANY, INC.; PURDUE PHARMACEUTICALS, L.P.; TEVA PHARMACEUTICALS USA, INC.; MCKESSON CORPORATION; AMERISOURCE BERGEN DRUG CORPORATION; CARDINAL HEALTH, INC.; CARDINAL HEALTH 6 INC.; CARDINAL HEALTH TECHNOLOGIES LLC; CARDINAL HEALTH 108 LLC D/B/A METRO MEDICAL SUPPLY; ABBVIE, INC.; ABBVIE US, LLC; DEPOMED, INC.; DAIICHI SANKYO, INC.; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC F/K/A ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; INSYS THERAPEUTICS, INC.; MALLINCKRODT LLC; MALLINCKRODT BRAND PHARMACEUTICALS INC.; MALLINCKRODT US HOLDINGS, INC., ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a

Case No.

(Removal from: District Court, Washoe County, Nevada)

**NOTICE OF REMOVAL**

1

WATSON PHARMA, INC.; ROBERT GENE RAND, M.D. AND RAND FAMILY CARE, LLC.; DOES 1 through 100; ROE CORPORATIONS 1 through 100 and ZOE PHARMACIES 1 through 100, inclusive,

Defendants.

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441, 1446, and 1367, Defendant McKesson Corporation ("McKesson") has removed the above-captioned action from the Second Judicial District Court for Washoe County, Nevada, to the United States District Court for the District of Nevada.  As grounds for removal, McKesson states:

I.  **NATURE OF REMOVED ACTION**

1. On September 18, 2018, the City of Reno, Nevada ("Plaintiff") filed *City of Reno v. Purdue Pharma L.P., et al.*, in the Second Judicial District Court for Washoe County, Nevada. The court assigned the action Case No. CV1801895.

2. The Complaint asserts claims against five groups of defendants.

3. The first group of defendants consists of Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company Inc.; Purdue Pharmaceuticals, L.P.; Abbvie, Inc.; Abbvie US, LLC; Depomed, Inc.; Daiichi Sankyo, Inc.; Teva Pharmaceuticals USA, Inc.; Teva Pharmaceuticals Industries Ltd.[1]; Cephalon, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Janssen Pharmaceutica, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc. n/k/a Janssen Pharmaceuticals, Inc.; Endo Health Solutions Inc.; Endo Pharmaceuticals, Inc.; Allergan PLC f/k/a Actavis PLC; Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; Watson Laboratories, Inc.; Insys Therapeutics, Inc.; Mallinckrodt LLC; Mallinckrodt Brand Pharmaceuticals Inc.; Mallinckrodt US Holdings, Inc., Actavis LLC; and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc. (collectively, the "Manufacturer Defendants"). Compl. ¶¶ 48-63.

---

[1] Teva Pharmaceuticals Industries Ltd. is not named in the case caption but is included in the body of the Complaint under the "Defendants, Drug Manufacturers" heading.  Compl. ¶ 53.

2

4. The second group of defendants consists of AmerisourceBergen Drug Corporation; Cardinal Health, Inc.; Cardinal Health 6 Inc.; Cardinal Health Technologies LLC; Cardinal Health 108 LLC d/b/a Metro Medical Supply; and McKesson Corporation (collectively, the "Distributor Defendants"). Compl. ¶¶ 64-71.

5. The third group of defendants consists of Aida B. Maxsam; Allison Foster; and James Kumle (collectively, "Detailer Defendants")[2]. Compl. ¶¶ 72-73.

6. The fourth group of defendants consists of Robert Gene Rand, M.D. and Rand Family Care, LLC (collectively, "Health Care Provider Defendants"). Compl. ¶¶ 77-82.

7. The fifth and final group of defendants consists of Does 1 through 100; Roe Corporations 1 through 100; and Zoe Pharmacies 1 through 100 (collectively, "Unnamed Defendants").

8. The Complaint asserts six counts against McKesson and the other Distributor Defendants: public nuisance (First Cause of Action); common law public nuisance (Second Cause of Action); negligent misrepresentation (Third Cause of Action); negligence (Fourth Cause of Action); unjust enrichment (Fifth Cause of Action); and punitive damages (Sixth Cause of Action). *See* Compl. ¶¶ 178-292.

9. Plaintiff pleads, among other things, that Distributor Defendants "have a duty to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement," Compl. ¶ 141, that the Distributor Defendants "must also stop shipment on any order which is flagged as suspicious" *id.* ¶ 145, and that Distributor Defendants "intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids," *id.* ¶ 188.

10. Because the duties governing reporting and shipping "suspicious" opioid orders arise from the federal Controlled Substances Act ("CSA") and its implementing regulations, Plaintiff pleads that alleged violations of federal law form the basis for its claims.

---

[2] Although the Detailer Defendants are not named in the case caption, they are referenced in the body of the Complaint.

3

11. McKesson has not responded to the Complaint and has no obligation to do so prior to being served with the Complaint.

12. On December 5, 2017, the Judicial Panel on Multidistrict Litigation (JPML) formed a multidistrict litigation (MDL) and transferred opioid-related actions to Judge Dan Polster in the Northern District of Ohio pursuant to 28 U.S.C. § 1407. *See In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (J.P.M.L. Dec. 5, 2017), ECF No. 328. McKesson intends to tag this case immediately for transfer to the MDL.

13. In accordance with 28 U.S.C. § 1446(a), copies of the docket sheet and all pleadings in the state court action are attached as **Exhibit A**.

## II. TIMELINESS OF REMOVAL

14. Plaintiff has not yet served the Complaint on McKesson. Accordingly, the 30-day removal period contemplated by 28 U.S.C. § 1446(b) has not yet begun to run. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 354-56 (1999) (30-day removal period begins upon service of summons and complaint).

## III. PROPRIETY OF VENUE

15. Venue is proper in this district under 28 U.S.C. § 1441(a) because the state court where the suit has been pending is in this district.

## IV. BASIS OF REMOVAL

16. Removal is proper pursuant to 28 U.S.C. §§ 1441 and 1331 because Plaintiff's claims present a substantial federal question under the CSA, 21 U.S.C. §§ 801, *et seq.*

17. The original jurisdiction of the district courts includes jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

18. "Whether a case arises under federal law for purposes of § 1331" is governed by the "well-pleaded complaint rule." *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 830 (2002).

19. Even when state law creates the causes of action, a complaint may raise a substantial question of federal law sufficient to warrant removal if "vindication of a right under state law necessarily turn[s] on some construction of federal law." Merrell Dow Pharm. Inc., v. Thompson,

478 U.S. 804, 808-09 (1986) (citation omitted); see also Gully v. First Nat'l Bank, 299 U.S. 109, 112 (1936) ("To bring a case within [§ 1441], a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action.").3

20.     "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress."  Gunn v. Minton, 568 U.S. 251, 258 (2013); see Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 315 (2005).  "Where all four of these requirements are met . . . jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and federal courts."  Gunn, 568 U.S. at 258.

21.     As set forth below, this case meets all four requirements.4

---

[3] A defendant need not overcome any artificial presumptions against removal or in favor of remand.  In *Breuer v. Jim's Concrete of Brevard, Inc.*, 538 U.S. 691 (2003), the Supreme Court unanimously held that the 1948 amendments to the general federal removal statute, 28 U.S.C. § 1441(a), trumped the Court's prior teachings in *Shamrock Oil & Gas Corp. v. Sheets*, 313 U.S. 100 (1941), and its antecedents, that federal jurisdictional statutes must be strictly construed against any recognition of federal subject matter jurisdiction, with every presumption indulged in favor of remand.  *Id*. at 697-98 ("[W]hatever apparent force this argument [of strict construction against removal] might have claimed when *Shamrock* was handed down has been qualified by later statutory development. . . .  Since 1948, therefore, there has been no question that whenever the subject matter of an action qualifies it for removal, *the burden is on a plaintiff to find an express exception*.") (emphasis added); *see also Exxon Mobil Corp. v Allapattah Servs., Inc.*, 545 U.S. 546, 558 (2005) (construing 1990 enactment of 28 U.S.C. § 1367, authorizing supplemental federal subject matter jurisdiction, and holding: "We must not give jurisdictional statutes a more expansive interpretation than their text warrants; but it is just as important not to adopt an artificial construction that is narrower than what the text provides . . . Ordinary principles of statutory construction apply.") (citation omitted).

More recently, a unanimous Supreme Court in *Mims v. Arrow Financial Services, LLC* held: "Divestment of district court jurisdiction should be found no more readily than divestment of state court jurisdiction, given the longstanding and explicit grant of federal question jurisdiction in 28 U.S.C. § 1331."  132 S. Ct. 740, 749 (2012) (brackets, citations, and internal quotation marks omitted).

[4] The substantiality inquiry as it pertains to federal question jurisdiction is distinct from the merits of the case and has no bearing on the strength of Plaintiff's underlying claims.  *See Gunn v.*

22. Although Plaintiff ostensibly pleads some of its theories of recovery against McKesson as state law claims, it bases the underlying theory of liability on McKesson's alleged violations of federal law or alleged duties arising out of federal law, specifically the CSA, i.e., that a portion of its otherwise lawful shipments of prescription opioids were unlawful because they were shipped in fulfillment of suspicious orders that McKesson allegedly had a duty to identify, report, and then not ship. Compl. ¶ 142.

23. The source of the asserted legal duty to monitor and report suspicious orders of controlled substances is the CSA, 21 U.S.C. §§ 801, et seq., and its implementing regulations. See Compl. ¶ 149(f) (citing 21 C.F.R. § 1301.74 as source of duty to "maintain a compliance program designed to detect and prevent the diversion of controlled substances").

24. The source of the asserted legal duty to suspend shipments of suspicious orders is 21 U.S.C. § 823(b) and (e), as interpreted by the Drug Enforcement Administration ("DEA") of the United States Department of Justice. Specifically, DEA interprets the public interest factors for registering distributors under the CSA, 21 U.S.C. § 823(b) and (e), to impose a responsibility on distributors to exercise due diligence to avoid filling suspicious orders that might be diverted to unlawful uses. See Masters Pharm., Inc. v. DEA, 861 F.3d 206, 212-13 (D.C. Cir. 2017) (citing In re Southwood Pharm., Inc., Revocation of Registration, 72 Fed. Reg. 36,487, 36,501, 2007 WL 1886484 (Drug Enf't Admin. July 3, 2007), as source of DEA's "Shipping Requirement").

25. Plaintiff's theories of liability against McKesson and other Distributor Defendants, as pled in the Complaint, are predicated on allegations that McKesson and Distributor Defendants breached alleged duties under the CSA to implement effective controls to detect and report "suspicious" pharmacy orders for prescription opioids and—crucial to Plaintiff's claims—to refuse to ship such orders to Nevada pharmacies.

26. Specifically, Plaintiff pleads that McKesson and the other Distributor Defendants violated federal law with, among others, the following allegations:

   a. "All opioid distributors are required and have a duty to maintain effective controls against opioid diversion. They are also required and have a duty to

---

*Minton*, 568 U.S. 251, 260 (2013) ("The substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole.").

6

create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency." Compl. ¶ 141

b. "To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion." *Id.* ¶ 142.

c. "Defendant Distributors each have a non-delegable duty to identify and track suspicious orders of controlled substances." *Id.* ¶ 144.

d. "In addition, Defendant Distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if, after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels." *Id.* ¶ 145.

e. "Defendant Distributors have a duty to detect questionable and suspicious orders to prevent the diversion of opioids into Reno, which include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency." *Id.* ¶ 146.

f. "On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ('2008 MOA') with the DEA which provided that McKesson would 'maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program.'" *Id.* ¶ 149(f).

g. "On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150 million civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL,

7

Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia Mi, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA." *Id.* ¶ 149(j).

h. "Over the course of a decade, Defendant Distributors and Pharmacies failed to detect suspicious orders of prescription opioids which Defendants knew or should have known were likely to be delivered and/or diverted into Reno." *Id.* ¶ 152.

i. "Defendants ignored the law, paid the fines, and continued to unlawfully fill suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or orders of unusual frequency in Reno, and/or orders which Defendants knew or should have known were likely to be delivered and/or diverted into Reno." *Id.* ¶ 153.

j. "Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Reno, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued. to ship and failed to halt suspicious orders of opioids. Such actions were inherently dangerous." *Id.* ¶ 188.

k. "Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintain effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders,

8

that the opioids would be diverted, and create an opioid abuse nuisance in Reno." *Id.* ¶ 189.

l. "Defendants created an absolute nuisance. Defendants' actions created and expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health and safety that diversion of opioids would create in Reno, however, Defendants intentionally and/or unlawfully failed to maintain effective controls against diversion through proper monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion. Defendants intentionally and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions were inherently dangerous." *Id.* ¶ 216.

m. "Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintain [sic] effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in Reno." *Id.* ¶ 217.

27. In alleging that Distributor Defendants have a "duty to maintain effective controls against opioid diversion," Compl. ¶ 141, Plaintiff can rely *only* on federal law. Plaintiff does not and cannot identify a state law that specifically requires wholesale pharmaceutical distributors to report and halt shipments of suspicious order for prescription opioids.

28. Moreover, Plaintiff's theory of liability also relies on an expansive reading of federal law that calls into question an agency determination. Plaintiff alleges not only that Distributor Defendants should have detected and reported discrete suspicious orders by individual pharmacies, but that Distributor Defendants should have recognized that the *total volume* of prescription opioids

9

distributed to various regions was suspicious or unreasonable. *See, e.g.*, Compl. ¶ 151 (alleging that the "sheer volume of prescription opioids distributed to pharmacies in Reno is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignore to them.").

29. To succeed on that theory, Plaintiff would thus have to show that the total quantity of prescription opioids that Distributor Defendants distributed was unreasonable. However, the total amount of prescription opioids distributed in any given year turns on annual aggregate production quotas established by the DEA. Specifically, the DEA must "determine the total quantity of each basic class of controlled substance listed in Schedule I or II necessary to be manufactured during the following calendar year to provide for the estimated medical, scientific, research and industrial needs of the United States, for lawful export requirements, and for the establishment and maintenance of reserve stocks." 21 C.F.R. § 1303.11(a). In making this determination, the DEA must consider "[p]rojected demand" for such substances. 21 C.F.R. § 1303.11(b). Thus, to show that the total quantity of prescription opioids that Distributor Defendants distributed was unreasonable, Plaintiff would have to show that the annual aggregate production quotas set by the DEA, pursuant to a federal statute, were themselves unreasonable.[5]

30. The federal question presented by Plaintiff's claims therefore is "(1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." Gunn, 568 U.S. at 258.

31. First, Plaintiff's state law claims "necessarily raise" a federal question because "[t]he resolution of this case turns on issues of federal law." Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth., 776 F.3d 463, 467 (7th Cir. 2015); see also N. Carolina ex rel. N. Carolina Dep't of Admin. v. Alcoa Power Generating, Inc., 853 F.3d 140, 146 (4th Cir. 2017)

---

[5] Moreover, 21 U.S.C. § 827(d)(1) requires Distributor Defendants to report to DEA "every sale, delivery or other disposal" by them of prescription opioids. In other words, Distributor Defendants already report to DEA the total volume of prescription opioids distributed. To succeed on its theory of liability that Distributor Defendants should have recognized and reported that the total volume of prescription opioids was unreasonable, Plaintiff would have to show that Distributor Defendants' existing reporting to the DEA was inadequate.

10

("Regardless of the allegations of a state law claim, where the vindication of a right under state law necessarily turns on some construction of federal law, the claim arises under federal law and thus supports federal question jurisdiction under 28 U.S.C. § 1331.") (alteration omitted); Virgin Islands Hous. Auth. v. Coastal Gen. Constr. Servs. Corp., 27 F.3d 911, 916 (3d Cir. 1994) ("[A]n action under 28 U.S.C. § 1331(a) arises only if the complaint seeks a remedy expressly granted by federal law or if the action requires construction of a federal statute, or at least a distinctive policy of a federal statute requires the application of federal legal principles.")  (emphasis added).

32. As pled, Plaintiff's claims against McKesson and the other Distributor Defendants require Plaintiff to establish that Distributor Defendants breached duties that are necessarily defined by reference to federal law, by failing to report and stop shipments of otherwise lawful orders of controlled substances to Nevada.

33. For example, in pleading public nuisance, Plaintiff alleges that Distributor Defendants "intentionally and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or taking other measures to maintain effective controls against diversion." Compl. ¶ 188. As noted, however, the duties to report and refuse to ship suspicious orders arise out of the CSA. Plaintiff's public nuisance claim thus "necessarily raise[s] disputed issues of federal law" because it is predicated on the violation of a "singular duty . . . [that] derives directly from federal law."  NASDAQ, 770 F.3d at 1022; see also Bd. of Commissioners of Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., 850 F.3d 714, 723 (5th Cir. 2017) ("The absence of any state law grounding for the duty that the [plaintiff] would need to establish for the Defendants to be liable means that that duty would have to be drawn from federal law.").

34. Although plaintiffs "may avoid federal jurisdiction by exclusive reliance on state law," Caterpillar, Inc. v. Williams, 482 U.S. 386, 392 (1987) (emphasis added), Plaintiff here alleges violations of federal law as the basis for its state-law claims.6  Plaintiff's Complaint necessarily

---

[6] It is not necessary for federal jurisdiction that McKesson establish that all of Plaintiff's counts against it raise a federal question.  Even if Plaintiff could prove one or more of those counts without establishing a violation of federal law, this Court still has federal question jurisdiction: "Nothing in the jurisdictional statutes suggests that the presence of related state law claims somehow alters the fact that [the] complaints, by virtue of their federal claims, were 'civil actions' within the federal

11

raises a federal issue—namely, whether Distributor Defendants violated the CSA by failing to report, prevent, or halt suspicious orders for prescription opioids.

35. As noted, the Complaint also raises a federal issue because it implicates the actions of a federal agency. See Empire Healthchoice Assur., Inc. v. McVeigh, 547 U.S. 677, 700 (2006) ("The dispute [in Grable] centered on the action of a federal agency (IRS) and its compatibility with a federal statute, the question qualified as 'substantial,' and its resolution was both dispositive of the case and would be controlling in numerous other cases."). Specifically, while Plaintiff alleges that the total volume of prescription opioids distributed by Distributor Defendants was unreasonable or suspicious, that figure turns on production quotas set by the DEA. Plaintiff's theory of liability thus calls into question the validity of the DEA's determinations under federal law. See Bd. of Comm'rs of the Se. Louisiana Flood Prot. Auth.-E. v. Tennessee Gas Pipeline Co., 29 F. Supp. 3d 808, 862 (E.D. La. 2014) ("While Plaintiff may not be expressly challenging a specific action of a federal agency, the breadth of Plaintiff's claims amounts to a collateral attack on an entire regulatory scheme."); McKay v. City & Cty. of San Francisco, 2016 WL 7425927, at *4 (N.D. Cal. Dec. 23, 2016) (concluding that complaint necessarily raises federal issue where "plaintiffs' claims are 'inescapably intertwined' with a collateral attack on an [agency] order").

36. Second, this federal issue is "actually disputed" because the parties disagree as to the scope and existence of alleged duties arising under the CSA and whether Distributor Defendants violated duties that, as Plaintiff pleads them, arise only under the CSA. Indeed, this federal issue is the "central point of dispute." Gunn, 568 U.S. at 259.

37. Third, the federal issue presented by Plaintiff's claims is "substantial." "The substantiality inquiry under Grable looks . . . to the importance of the issue to the federal system as a whole." Gunn, 568 U.S. at 260. Among other things, the Court must assess whether the federal

---

courts' 'original jurisdiction.'" *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 166 (1997).

Because the Court has original jurisdiction over at least one count here, it has supplemental jurisdiction over Plaintiff's remaining counts against McKesson and the other Distributor Defendants, which are so related that they "form part of the same case or controversy." 28 U.S.C. § 1367(a).

12

government has a "strong interest" in the federal issue at stake and whether allowing state courts to resolve the issue will "undermine the development of a uniform body of [federal] law." Id. at 260-62 (internal citations omitted). As the Supreme Court explained in Grable, "[t]he doctrine captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 545 U.S. at 312.

38. Plaintiff's theories of Distributor Defendants' liability necessarily require that a court determine the scope and existence of Distributor Defendants' obligations under federal law because regulation of controlled substances is first and foremost federal regulation. Indeed, Congress designed the CSA with the intent of reducing illegal diversion of controlled substances, "while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control." H.R. Rep. No. 1444, 91st. Cong., 2nd Sess. 1970, as reprinted in 1970 U.S.C.C.A.N. 4566, 4571-72.

39. Plaintiff's theories of Distributor Defendants' liability thus "involve aspects of the complex federal regulatory scheme applicable to" the national prescription drug supply chain, Broder, 418 F.3d at 195, and are "sufficiently significant to the development of a uniform body of [controlled substances] regulation to satisfy the requirement of importance to the federal system as a whole," NASDAQ, 770 F.3d at 1024. The CSA itself notes that "illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people" and that "[f]ederal control of the intrastate incidents of the traffic in controlled substances is essential to the effective control of the interstate incidents of such traffic." 21 U.S.C. § 801. Furthermore, "minimizing uncertainty over" reporting obligations under the CSA "fully justifies resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, N.A., 824 F.3d 308, 318 (2d Cir. 2016) (alteration and citation omitted); Rhode Island Fishermen's All., Inc, 585 F.3d at 51 (noting, in a case involving state law claims arising out of the implementation of an interstate fisheries compact, "there is a substantial

federal interest in ensuring that actions taken in pursuance of the Management Act receive the uniformity of interpretation that a federal forum offers.").

40. Plaintiff's attempt to enforce the CSA raises a substantial federal question even though the CSA does not provide for a private right of action. In 2005, in Grable, the Supreme Court held that lack of a federal cause of action does not foreclose federal-question jurisdiction. The Court stated that applying Merrell Dow too narrowly would both "overturn[ ] decades of precedent," and "convert[ ] a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one." Grable, 545 U.S. at 316; see also, e.g., Ranck v. Mt. Hood Cable Regulatory Comm'n, 2017 WL 1752954, at *4-*5 (D. Or. May 2, 2017) (state law claims based on violations of Cable Communications Policy Act raise substantial federal questions and satisfy Grable even though no private right of action exists under Act).

41. Removal is particularly appropriate here because Plaintiff's action is but one of more than 1,300 similar actions nationwide, of which more than 1,000 are pending in the MDL in the Northern District of Ohio. Indeed, Plaintiff acknowledges that opioid use and addiction is not merely a local issue, but that "the Food and Drug Administration (FDA) recognize[s] opioid abuse as a 'public health crisis' that has a 'profound impact on individuals, families and communities across our country.'" Compl. ¶ 17. The MDL judge, Judge Polster, is attempting to achieve a national solution to this nationwide problem.[7]

42. Fourth, and finally, the federal issue also is capable of resolution in federal court "without disrupting the federal-state balance approved by Congress." Gunn, 568 U.S. at 258. Federal courts exclusively hear challenges to DEA authority to enforce the CSA against distributors, and litigating this case in a state court runs the risk of the state court applying federal requirements inconsistently with the manner in which the federal agency tasked with enforcing the CSA—the DEA—applies them. Federal jurisdiction is further warranted given the hundreds of similar actions pending in the MDL, which "in the aggregate . . . have the potential to substantially influence the

---

[7] Less than two months after the MDL was created, Judge Polster convened the first day-long settlement conference on January 31, 2018. Judge Polster required attendance by party representatives and their insurers and invited attendance by Attorneys General and representatives of the DEA and FDA.

14

scope and success" of the federal statutory scheme to regulate controlled substances. Evergreen Square of Cudahy, 776 F.3d at 468. "Accordingly, the federal government has a strong interest in these issues being decided according to uniform principles[,]" which "will best be achieved by allowing suit in federal courts." Id.

43. In summary, removal of this action is appropriate because Plaintiff's "state-law claim[s] necessarily raise a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." Grable, 545 U.S. at 314; see also, e.g., Evergreen Square of Cudahy, 776 F.3d at 467-68 (state law claims alleging defendants' breached a contract for Section 8 housing by failing to approve rent increases satisfy Grable, raising issues that the "federal government has a strong interest in . . . being decided according to uniform principles."); New York ex rel. Jacobson, 824 F.3d at 315-18 (state law claims based on defendant's alleged violation of Internal Revenue Code satisfy Grable); NASDAQ, 770 F.3d at 1031 (state law claims premised on violations of Exchange Act "necessarily raise disputed issues of federal law of significant interest to the federal system as a whole"); Gilmore, 694 F.3d at 1176 ("Although plaintiffs could lose their conversion claim without the court reaching the federal question, it seems that they cannot win unless the court answers that question. Thus, plaintiffs' 'right to relief necessarily depends on resolution of a substantial question of federal law.'") (citation omitted); Broder, 418 F.3d at 196 (state law claims premised on cable provider's alleged violations of Communication Act's uniform rate requirement satisfy "Grable test for federal question removal jurisdiction").

44. To the extent that the Court determines that some, but not all, of Plaintiff's claims state a substantial federal question, the Court can evaluate whether to retain the non-federal claims against the Manufacturer Defendants, Distributor Defendants, Detailer Defendants, and Health Care Provider Defendants under the doctrine of supplemental jurisdiction. 28 U.S.C. § 1367(a).

V. **OTHER REMOVAL ISSUES**

45. While no defendants have been served with the Complaint, service is not a prerequisite for removal. See, e.g., Novak v. Bank of New York Mellon Trust Co., N.A., 783 F.3d 910, 912 (1st Cir. 2015) ("A defendant may remove a state-court action to federal court any time

15

after the lawsuit is filed but before the statutorily-defined period for removal ends"); Whitehurst v. Wal-Mart, 306 Fed. Appx. 446, 448 (11th Cir. 2008) ("[N]othing in the removal statute, or any other legal provision, requires that a defendant be served with the complaint before filing a notice of removal."); Delgado v. Shell Oil Co., 231 F.3d 165, 177 (5th Cir. 2000).

46. By filing this Notice of Removal, McKesson does not waive any available defense and expressly reserves all such defenses, including those related to personal jurisdiction and service of process.

47. If any question arises as to propriety of removal to this Court, McKesson requests the opportunity to present a brief and oral argument in support of its position that this case has been properly removed.

48. Pursuant to 28 U.S.C. § 1446(d), McKesson will promptly file a copy of this Notice of Removal with the clerk of the state court where the lawsuit has been pending and serve notice of the filing of this Notice of Removal on Plaintiff.

49. McKesson reserves the right to amend or supplement this Notice.

**WHEREFORE**, McKesson removes this action, pending in the Second Judicial District Court for the County of Washoe, Case No. CV18-01895, to this Court.

| | |
|---|---|
| September 20, 2018 | */s/* STEVE MORRIS |
| | Steve Morris |
| | Rosa Solis-Rainey |
| | MORRIS LAW GROUP |
| | 411 E. Bonneville Ave., Ste. 360 |
| | Las Vegas, Nevada 89101 |
| | (702) 474-9400 |
| | sm@morrislawgroup.com |
| | rsr@morrislawgroup.com |
| | |
| | *Attorneys for Defendant, McKesson Corporation* |

16

**CERTIFICATE OF SERVICE**

Pursuant to Fed. R. Civ. P. 5(b) and Section IV of District of Nevada Electronic Filing Procedures, I certify that I am an employee of MORRIS LAW GROUP, and that the following document was served via electronic service: DEFENDANT McKESSON NOTICE OF REMOVAL

TO:

Bill Bradley
BRADLEY, DRENDEL & JEANNEY
6900 s. McCarran Blvd., Ste. 2000
Reno, Nevada 89509
office@bdjlaw.com

Robert T. Eglet
Robert Adams
Richard K. Hy
EGLET PRINCE
400 S. 7th Street, 4th Floor
Las Vegas, Nevada 89101
eservice@egletlaw.com

DATED this 20th day of September, 2018.

By: */s/* GABRIELA MERCADO
An Employee of Morris Law Group

17