# EXHIBIT A

## (part 1)

Second Judicial District Court Docket Report (9/20/18)
&
Complaint Filed in the Second Judicial District Court



Second Judicial District Court
State of Nevada
Washoe County

**Electronic Filing**

## Case Summary for Case: CV18-01895

### CITY OF RENO VS. PURDUE PHARMA, LP; ET AL (D8)

| | | | |
|---|---|---|---|
| **Case Number** | CV18-01895 | **Plaintiff** | CITY OF RENO |
| **Case Type** | OTHER TORT | **Defendant** | ACTAVIS LLC et al |
| **Opened** | 09-18-2018 | **Judge** | HONORABLE BARRY L. BRESLOW - Division D8 |
| **Status** | PENDACTIVE | | |

⊞ Show/Hide Participants

| File Date | | Case History |
|---|---|---|
| 09-18-2018 | Notice of Electronic Filing | |
| | Filed | |
| | Document withheld. Document Security Level Exceeded | |
| 09-18-2018 Plaintiff | Demand for Jury | |
| | Filed by: ROBERT M. ADAMS, ESQ. | |
| | Document withheld. Document Security Level Exceeded | |
| 09-18-2018 Plaintiff | Complaint - Civil | |
| | Filed by: ROBERT M. ADAMS, ESQ. | |
| | Document withheld. Document Security Level Exceeded | |

## Case Information

| | |
|---|---|
| **Case Description:** | CV18-01895 - CITY OF RENO VS. PURDUE PHARMA, LP; ET AL (D8) |
| **Filing Date:** | 09/18/2018 |
| **Case Type:** | TO - OTHER TORT |
| **Status:** | Pending Active |

**Case Cross Reference**
Cross Reference Number
**No Cross Reference Numbers Available**

**Case Parties**

| Seq | Type | Name |
|---|---|---|
| 1 | JUDG - Judge | BRESLOW, BARRY L. |
| 2 | ATTY - Attorney | Adams, Esq., Robert M. |
| 3 | DEFT - Defendant | ACTAVIS LLC, |
| 4 | DEFT - Defendant | ACTAVIS PHARMA, INC. F/K/A WATSON PHARMA, INC., |
| 5 | DEFT - Defendant | RAND, MD, ROBERT GENE |
| 6 | DEFT - Defendant | RAND FAMILY CARE, LLC, |
| 7 | DEFT - Defendant | CARDINAL HEALTH TECHNOLOGIES LLC, |
| 8 | DEFT - Defendant | CARDINAL HEALTH 108 LLC D/B/A METRO MEDICAL SUPPLY, |
| 9 | DEFT - Defendant | ABBVIE, INC., |
| 10 | DEFT - Defendant | ABBVIE US, LLC, |
| 11 | DEFT - Defendant | DEPOMED, INC., |
| 12 | DEFT - Defendant | DAIICHI SANKYO, INC., |
| 13 | DEFT - Defendant | CEPHALON, INC., |
| 14 | DEFT - Defendant | JOHNSON & JOHNSON, |
| 15 | DEFT - Defendant | JANSSEN PHARMACEUTICALS, INC., |
| 16 | DEFT - Defendant | JANSSEN PHARMACEUTICA, INC. N/K/A, |
| 17 | DEFT - Defendant | ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. N/K/A JANSSEN, |
| 18 | DEFT - Defendant | PURDUE PHARMA, L.P., |
| 19 | DEFT - Defendant | ENDO HEALTH SOLUTIONS INC., |
| 20 | DEFT - Defendant | PURDUE PHARMA, INC., |
| 21 | DEFT - Defendant | ENDO PHARMACEUTICALS, INC., |
| 22 | DEFT - Defendant | THE PURDUE FREDERICK COMPANY, INC., |
| 23 | DEFT - Defendant | ALLERGAN PLC F/K/A ACTAVIS PLC, |
| 24 | DEFT - Defendant | PURDUE PHARMACEUTICALS, L.P., |
| 25 | DEFT - Defendant | ACTAVIS, INC. F/K/A WATSON PHARMACEUTICALS, INC., |
| 26 | DEFT - Defendant | TEVA PHARMACEUTICALS USA, INC., |
| 27 | DEFT - Defendant | WATSON LABORATORIES, INC., |
| 28 | DEFT - Defendant | MCKESSON CORPORATION, |
| 29 | DEFT - Defendant | INSYS THERAPEUTICS, INC., |
| 30 | DEFT - Defendant | AMERISOURCEBERGEN DRUG CORPORATION, |
| 31 | DEFT - Defendant | MALLINCKRODT, LLC, |
| 32 | DEFT - Defendant | MALLINCKRODT BRAND PHARMACEUTICALS INC., |
| 33 | DEFT - Defendant | CARDINAL HEALTH, INC., |
| 34 | DEFT - Defendant | MALLINCKRODT US HOLDINGS, INC., |
| 35 | DEFT - Defendant | CARDINAL HEALTH 6 INC., |
| 36 | ATTY - Attorney | Eglet, Esq., Robert T. |
| 37 | ATTY - Attorney | Hy, Esq., Richard K. |
| 38 | ATTY - Attorney | Bradley, Jr., Esq., Bill |
| 39 | PLTF - Plaintiff | CITY OF RENO, |

**Event Information**

| Date/Time | Hearing Judge | Event Description | Outcome |
|---|---|---|---|
| **No Event Information Available** | | | |

**Docket Entry Information**

| Docket Description | Date Filed | Extra Text |
|---|---|---|

| | | |
|---|---|---|
| PAYRC - **Payment Receipted | 09/18/2018 | Extra Text: A Payment of $320.00 was made on receipt DCDC620358. |
| JF - **First Day Jury Fees Deposit | 09/18/2018 | Extra Text: CITY OF RENO - Transaction 6885766 - Approved By: PMSEWELL : 09-18-2018:15:14:36 |
| NEF - Proof of Electronic Service | 09/18/2018 | Extra Text: Transaction 6885815 - Approved By: NOREVIEW : 09-18-2018:15:15:44 |
| 1580 - Demand for Jury | 09/18/2018 | Extra Text: CITY OF RENO - Transaction 6885766 - Approved By: PMSEWELL : 09-18-2018:15:14:36 |
| 1425 - Complaint - Civil | 09/18/2018 | Extra Text: Transaction 6885138 - Approved By: PMSEWELL : 09-18-2018:13:57:07 |

Notice: This is NOT an Official Court Record

FILED
Electronically
CV18-01895
2018-09-18 01:23:24 PM
Jacqueline Bryant
Clerk of the Court
Transaction # 6885138 : pmsewell

**COMP**
ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
RICHARD K. HY, ESQ.
Nevada Bar No. 12406
**EGLET PRINCE**
400 S. 7th Street, 4th Floor
Las Vegas, NV 89101
Tel.: (702) 450-5400
Fax: (702) 450-5451
E-Mail: eservice@egletlaw.com
-and-
BILL BRADLEY, ESQ.
Nevada Bar No. 1365
**BRADLEY, DRENDEL & JEANNEY**
6900 S. McCarran Blvd., Suite 2000
Reno, Nevada 89509
Telephone:    (775) 335-9999
Email:  office@bdjlaw.com
*Attorneys for Plaintiff, the City of Reno*

## IN THE SECOND JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA IN AND FOR THE COUNTY OF WASHOE

| | |
|---|---|
| CITY OF RENO, | ) Case No.: |
| | ) Dept No.: |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| | ) **COMPLAINT** |
| PURDUE PHARMA, L.P.; PURDUE | ) |
| PHARMA, INC.; THE PURDUE | ) |
| FREDERICK COMPANY, INC.  d/b/a THE | ) |
| PURDUE FREDERICK COMPANY, INC.; | ) |
| PURDUE PHARMACEUTICALS, L.P.; | ) |
| TEVA PHARMACEUTICALS USA, INC.; | ) |
| McKESSON CORPORATION; | ) |
| AMERISOURCEBERGEN DRUG | ) |
| CORPORATION; CARDINAL HEALTH, | ) |
| INC.;  CARDINAL HEALTH 6 INC.; | ) |
| CARDINAL HEALTH TECHNOLOGIES | ) |
| LLC; CARDINAL HEALTH 108 LLC d/b/a | ) |

1  METRO MEDICAL SUPPLY; ABBVIE, )
   INC.; ABBVIE US, LLC; DEPOMED, INC.; )
2  DAIICHI SANKYO, INC.; CEPHALON, )
   INC.; JOHNSON & JOHNSON; JANSSEN )
3  PHARMACEUTICALS, INC.; JANSSEN )
   PHARMACEUTICA, INC. n/k/a JANSSEN )
4  PHARMACEUTICALS, INC.; ORTHO- )
   MCNEIL-JANSSEN PHARMACEUTICALS, )
5  INC. n/k/a JANSSEN PHARMACEUTICALS,)
   INC.; ENDO HEALTH SOLUTIONS INC.; )
6  ENDO PHARMACEUTICALS, INC.; )
7  ALLERGAN PLC f/k/a ACTAVIS PLC; )
   ACTAVIS, INC. f/k/a WATSON )
8  PHARMACEUTICALS, INC.; WATSON )
9  LABORATORIES, INC.; INSYS )
   THERAPEUTICS, INC., MALLINCKRODT, )
10 LLC; MALLINCKRODT BRAND )
11 PHARMACEUTICALS INC.; and )
   MALLINCKRODT US HOLDINGS, INC.; )
12 ACTAVIS LLC; AND ACTAVIS PHARMA, )
13 INC. f/k/a WATSON PHARMA, INC.; )
   ROBERT GENE RAND, M.D. AND RAND )
14 FAMILY CARE, LLC; DOES 1 through 100; )
15 ROE CORPORATIONS 1 through 100; and )
   ZOE PHARMACIES 1 through 100, inclusive, )
16                                        )
17         Defendants.                    )
   _____)

18

19     Plaintiff City of Reno, by and through the undersigned attorneys, files this Complaint

20 against the named Defendants seeking to recover its damages as a result of the opioid epidemic

21 Defendants caused, and alleges as follows:

22                                **INTRODUCTION**

23     1.     Opioid addiction and overdose in the United States as a result of prescription

24 opioid use has reached epidemic levels over the past decade.

25     2.     The abuse of opioids is a widespread problem in the State of Nevada as well as the

26 City of Reno specifically.

27     3.     Nevada ranked as the sixth highest state for the number of milligrams of opioids

28 distributed per adult, in 2016.

2

4.      In 2016, Nevadans were prescribed opioids at a rate of 87 prescriptions per 100 residents.

5.      In that same year, the rate of overdose deaths in Nevada exceeded the national average.

6.      Nevada has had the fourth highest drug overdose mortality rate in the United States.

7.      The dramatic increase in prescription opioid use over the last two decades, and the resultant public-health crisis, is no accident.

8.      The crisis was precipitated by Defendants, who, through deceptive means, and using one of the biggest pharmaceutical marketing campaigns in history, carefully engineered and continue to support a dramatic shift in the culture of prescribing opioids by falsely portraying both the risks of addiction and abuse and the safety and benefits of long-term use.

9.      Defendant drug companies named herein, manufacture, market, and sell prescription opioids (hereinafter "opioids"), including brand-name drugs like Oxycontin, Vicodin and Percocet, as well as generics like oxycodone and hydrocodone, which are powerful narcotic painkillers.

10.     Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat short-term acute pain or for palliative (end-of-life) care.

11.     Defendants' goal was simple: to dramatically increase sales by convincing doctors that it was safe and efficacious to prescribe opioids to treat not only the kind of severe and short-term pain associated with surgery or cancer, but also for a seemingly unlimited array of less severe, longer-term pain, such as back pain, headaches and arthritis.

12.     Defendants knew that their opioid products were addictive, subject to abuse, and not safe or efficacious for long-term use.

13.     Defendants' nefarious plan worked and they dramatically increased their sales and reaped billions upon billions of dollars of profit at the expense of millions of people who are now addicted and the thousands who have died as a result.

14.     While Americans represent only 4.6% of the world's population, they consume over 80% of the world's opioids.

3

15. Since 1999, the amount of prescription opioids sold in the U.S. has nearly quadrupled. In 2010, 254 million prescriptions were filled in the U.S. – enough to medicate every adult in America around the clock for a month. In that year, 20% of all doctors' visits resulted in the prescription of an opioid (nearly double the rate in 2000).

16. By 2014, nearly two million Americans either abused or were dependent upon opioids.

17. On March 22, 2016, the Food and Drug Administration (FDA) recognized opioid abuse as a "public health crisis" that has a "profound impact on individuals, families and communities across our country."

18. The Centers for Disease Control (CDC) reports that overdoses from prescription opioids are a driving factor in the 15-year increase in opioid overdose deaths.

19. From 2000 to 2015, more than half a million people died from drug overdoses (including prescription opioids and heroin). The most recent figures from the CDC suggest that 175 Americans die every day from an opioid overdose (prescription and heroin).

20. Many addicts, finding painkillers too expensive or too difficult to obtain, have turned to heroin. According to the American Society of Addiction Medicine, four out of five people who try heroin today started with prescription painkillers.

21. County and city governments and the services they provide their citizens have been strained to the breaking point by this public health crisis.

22. Defendant drug companies should never place their desire for profits above the health and well-being of their customers or the communities where those customers live, because they know prescribing doctors and other health-care providers rely on their statements in making treatment decisions, and drug companies must tell the truth when marketing their drugs and ensure that their marketing claims are supported by science and medical evidence.

23. Defendants broke these simple rules and helped unleash a healthcare crisis that has had far-reaching financial, social, and deadly consequences in the City of Reno and throughout Nevada.

4

24.     Defendants falsely touted the benefits of long-term opioid use, including the supposed ability of opioids to improve function and quality of life, even though there was no "good evidence" to support their claims.

25.     Defendants disseminated these common messages to reverse the popular and medical understanding of opioids.

26.     As a result of the drug companies' marketing campaign, opioids are now the most prescribed class of drugs generating over $11 billion in revenue for drug companies in 2014 alone.

27.     As a result of the drug companies' marketing campaign, the fatalities continued to mount while the living continue to suffer.

28.     In 2017, a record number of drug overdoses claimed the lives of about 72,000 Americans, a 10.2 percent increase from 2016. According to the CDC the death toll from drug overdoses was higher than the peak yearly death totals from H.I.V., gun deaths, or car crashes. The increase of deaths related to drug overdoses was linked to two major factors: (i) a growing number of Americans are using opioids, and (ii) drugs are becoming deadlier.

29.     This trend of increased opioid abuse has been well documented in the last several years. In 2015, over 33,000 Americans died of a drug overdose involving opioids with studies suggesting that these fatalities are statistically underreported. And in 2016, 2.1 million Americans had opioid use disorders, according to a government survey, but that figure could be as high as 4 million.

30.     Most opioid related deaths occur among those between the ages of approximately 25 and 55 years old.  Studies have shown that the overall fatality rate was 10.3 deaths per 100,000 population, and in the 25 to 55 year old age group, fatality rates were much higher, ranging from 16.1 to 22.0 deaths per 100,000 population.

31.     In 2015, the estimated economic impact of the opioid crisis was $504 billion, or 2.8 % of our U.S.'s gross domestic product that same year.  Previous estimates of the economic cost of the opioid crisis greatly understate it by undervaluing the most important component of the loss—fatalities resulting from overdoses.



**Figure 2. Opioid–involved Overdose Deaths by Age in 2015**
(Number of deaths)

Source: CDC Wonder database, multiple cause of death files

32.     In addition to the cost of fatalities each year, opioid misuse among the living imposes important costs as well.  It is estimated that prescription opioid misuse increases healthcare and substance abuse treatment costs in the United States by $29.4 billion, increases criminal justice costs by $7.8 billion, and reduces productivity among those who do not die of overdose by $20.8 billion (in 2015 $). The total nonfatal cost of $58.0 billion divided by the 1.9 million individuals with a prescription opioid disorder in 2013 results in an average cost of approximately $30,000.[1] And when patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin, fueling the secondary drug market.

33.     Further compounding issue is that this problem is worsening at an alarming rate. According to a report published by the White House Council of Economic Advisors (CEA), opioid-involved overdose deaths have doubled in the past ten years and quadrupled in the past sixteen.

---

[1] Florence, C., Zhou, C., Luo, F. and Xu, L. 2016. "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013." *Medical Care*, 54(10): 901-906.

6

1
2
3
4
5
6
7
8
9
10
11
12
13
14



**Figure 1. Opioid-involved Overdose Deaths, 1999-2015**
(Thousands of Deaths)

Source: CDC Wonder database, multiple cause of death files

15     34.     The crisis that Defendants caused has directly impacted the City of Reno as it bears

16  the financial brunt of this epidemic as it unfolds in our community.

17     35.     Apart from the toll on human life, the crisis has financially strained the services

18  the City of Reno provides its residents and employees. Human services, social services, court

19  services, law enforcement services, the office of the coroner/medical examiner and health services,

20  including hospital, emergency and ambulatory services, have all been severely impacted by the

21  crisis. For example, as a direct and foreseeable consequence of Defendants' egregious conduct,

22  the City of Reno paid, and continues to pay, a significant amount for health care costs that stem

23  from prescription opioid dependency. These costs include unnecessary and excessive opioid

24  prescriptions, substance abuse treatment services, ambulatory services, emergency department

25  services, and inpatient hospital services, among others. Defendants' conduct also caused the City

26  of Reno to incur substantial economic, administrative and social costs relating to opioid addiction

27  and abuse, including criminal justice costs, victimization costs, child protective services costs,

28  lost productivity costs, and education and prevention program costs among others.

36.     After creating a public health crisis, Defendants have not pulled their opioid products from the market, acknowledged the very real dangers of addiction and abuse even if the opioids are taken as prescribed, or acknowledged that opioids are inappropriate for long-term pain management. Instead, Defendants have taken the position that their opioid products are not dangerous and continue to sell these dangerous and addictive drugs, thereby continuing to fuel the crisis.

37.     As a result, physicians, pharmacists and patients are not able to appropriately and adequately evaluate the relevant risks associated with opioids use, particularly the risks to patients who have been and are being exposed to, unnecessarily, including but not limited to the risk of severe and disabling addiction, actual addiction, the consequences of addiction, and other adverse medical conditions. Additionally, the rising numbers of persons addicted to opioids have led to a dramatic increase of social problems, including drug abuse and diversion and the commission of criminal acts to obtain opioids. Consequently, public health and safety have been significantly and negatively impacted due to the misrepresentations and omissions by Defendants regarding the appropriate uses and risks of opioids, ultimately leading to widespread inappropriate use of the drug.

38.     As a result of Defendants' misconduct, physicians, pharmacists and patients have not been provided with accurate information about the appropriate uses, risks and safety of these drugs, thus causing the crisis before us as well as giving rise to this lawsuit.

39.     Plaintiff files this Complaint naming the drug companies herein as Defendants and placing the industry on notice that the City of Reno is taking action to abate the public nuisance that plagues our community.

40.     By its Complaint, the City of Reno seeks to recover from Defendants its damages as a result of the opioid public-health crisis Defendants caused.  Namely, this action is brought by this Plaintiff pursuant to constitutional, statutory, common law and/or equitable authority for purposes of, *inter alia*:

        a.     recovering restitution and reimbursement for all the costs the City of Reno has incurred in paying excessive and unnecessary prescription costs related to opioids;

8

b.   recovering restitution and reimbursement for all the costs expended by the City of Reno for health care services and programs associated with the diagnosis and treatment of adverse health consequences of opioids use, including but not limited to, addiction;

c.   recovering restitution and reimbursement for all the costs consumers have incurred in excessive and unnecessary prescription costs related to opioids;

d.   disgorgement;

e.   recovering damages for all costs incurred and likely to be incurred in an effort to combat the abuse and diversion of opioids in the City of Reno;

f.   recovering damages incurred as costs associated with the harm done to the public health and safety.

41.   However, Plaintiff does not bring claims, as part of this action, for products liability nor does the City seek compensatory damages for death, physical injury to person, emotional distress, or physical damage to property.

## PARTIES AND JURISDICTION

### A. Plaintiff, City of Reno.

42.   Plaintiff, City of Reno ("Reno" or "Plaintiff"), is a municipality organized under the laws of the State of Nevada.

43.   Plaintiff provides a wide range of services on behalf of its residents, including services for families and children, public health, public assistance, law enforcement, and emergency care.

44.   Plaintiff has all the powers possible for a municipality to have under the constitution of the State of Nevada, the laws of the State of Nevada, and its city charter.

45.   Plaintiff has standing to bring this litigation to provide for the orderly government of Reno and to address matters of local concern including the public health, safety, prosperity, security, comfort, convenience and general welfare of its citizens.

46.   Reno declares that the unlawful distribution of prescription opiates, by the Defendants named herein, has created a serious public health crisis of opioid abuse, addiction, morbidity and mortality and is a public nuisance.

9

1       47.    Plaintiff is authorized by law to abate any nuisance and prosecute in any court of

2  competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance

3  to exist and prevent injury and annoyance from such nuisance.

4       **B. Defendants, Drug Manufacturers.**

5       48.    Defendant PURDUE PHARMA L.P. is a limited partnership organized under the

6  laws of Delaware, and registered and authorized to do business in the State of Nevada, under the

7  laws thereof.  At all times relevant herein, PURDUE PHARMA L.P. takes and took advantage of

8  the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend

9  drug patents. PURDUE PHARMA INC. is a corporation organized under the laws of both

10  Delaware and New York, with its principal place of business in Stamford, Connecticut, and THE

11  PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of

12  business in Stamford, Connecticut. Defendant PURDUE PHARMACEUTICALS, L.P., ("Purdue

13  Pharmaceuticals") is and was a limited partnership organized under the laws of the State of

14  Delaware.   At all times relevant hereto, the foregoing, (collectively, "PURDUE") are and were

15  in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing,

16  selling and/or distributing OxyContin and have done so to and within the State of Nevada. At all

17  times relevant herein, PURDUE hired "Detailers" in Reno, Nevada, to make personal contact with

18  physicians and clinics to advocate for the purchase and use of opioid medications which were

19  contrary to known safety concerns and sound medical advice.

20       49.    Defendant ABBVIE, INC. is a corporation organized under the laws of the state

21  of Delaware.  ABBVIE, INC. is the surviving corporation which embodies the specialty drugs

22  arm which was formerly a part of Abbot Laboratories, prior to a 2013 split.  Abbot Laboratories

23  was the father, originator and disseminator of the aggressive, deceptive and fraudulent marketing

24  program which lies at the heart of the opioid crisis.

25       50.    Defendant ABBVIE US, LLC is an LLC organized under the laws of Delaware,

26  and at all relevant times herein was registered and authorized to do business within the State of

27  Nevada.  ABBVIE US, LLC conducts drug research, manufactures drugs, and distributes drugs.

28  ABBVIE US, LLC is a wholly-owned subsidiary of ABBVIE, INC., and  ABBVIE, INC. and its

subsidiaries continue to patent, manufacture and sell opioids into and within Reno, Nevada.  At

1   all times relevant herein, ABBVIE, INC. and ABBVIE US, LLC take and took advantage of the

2   legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend drug

3   patents.  Defendant ABBVIE, INC. also hires lobbyists specifically to lobby the Nevada State

4   Legislature to strengthen laws protecting their profits, and to weaken laws protecting the health

5   and welfare of Nevada citizens, including the citizens of Reno.

6         51.   Defendant DEPOMED, INC. is a corporation organized under the laws of the State

7   of California and headquartered in Newark, California.  At all times relevant herein, DEPOMED

8   INC. was and is engaged in the manufacturing, distribution and the sale of opioid drugs into and

9   within Washoe County, Nevada.  At all times relevant herein, DEPOMED INC. hired "Detailers"

10  in Washoe County, Nevada, to make personal contact with physicians and clinics to advocate for

11  the purchase and use of opioid medications which were contrary to known safety concerns and

12  sound medical advice.

13        52.   Defendant DAIICHI SANKYO, INC. is a corporation organized under the laws of

14  the State of Delaware and headquartered in Basking Ridge, New Jersey.  At all times relevant

15  herein, DAIICHI SANKYO, INC. was and is engaged in the manufacturing, distribution and the

16  sale of opioid drugs into and within Washoe County, Nevada.  At all times relevant herein,

17  DAIICHI SANKYO INC. was and is registered and authorized to do business within the State of

18  Nevada.  At all times relevant herein, DAIICHI SANKYO, INC. hired "Detailers" in Washoe

19  County, Nevada, to make personal contact with physicians and clinics to advocate for the purchase

20  and use of opioid medications which were contrary to known safety concerns and sound medical

21  advice.  A known deceptive marketing practice for opioids, is the labeling of them as "abuse-

22  deterrent."  In 2017, DAIICHI SANKYO, INC. released their own line of "abuse deterrent"

23  Oxycodone formulations for sale.

24        53.   Defendant TEVA PHARMACEUTICALS USA, INC., is a Delaware corporation

25  with its principal place of business located in North Whales, Pennsylvania. Teva USA is a wholly

26  owned subsidiary of TEVA PHARMACEUTICALS INDUSTRIES LTD., an Israeli Corporation.

27  TEVA develops, makes, manufactures, and distributes generic opioid medications worldwide,

28  including within Washoe County, Nevada.

11

1      54.    Defendant CEPHALON, INC., is Delaware corporation with its principal place of

2  business located in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired CEPHALON, INC.

3      55.    Defendant JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania

4  corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned

5  subsidiary of JOHNSON & JOHNSON, a New Jersey corporation with its principal place of

6  business in New Brunswick, New Jersey. JANSSEN PHARMACEUTICALS, INC., was

7  formerly known as ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., which in turn

8  was formerly known as Janssen Pharmaceutica Inc. Defendant ORTHO-MCNEIL-JANSSEN

9  PHARMACEUTICALS, INC., now known as JANSSEN PHARMACEUTICALS, INC., is a

10  Pennsylvania corporation with its principal place of business in Titusville, New Jersey. Janssen

11  Pharmaceutica, Inc., now known as JANSSEN PHARMACEUTICALS, INC., is a Pennsylvania

12  corporation with its principal place of business in Titusville, New Jersey. Johnson & Johnson is

13  the only company that owns more than 10% of Janssen Pharmaceuticals, Inc.'s stock, and it

14  corresponds with the FDA regarding Janssen's products.

15      56.    Upon information and belief, Johnson & Johnson controls the sale and

16  development of Janssen Pharmaceutical's drugs, and Janssen Pharmaceuticals, Inc.'s profits inure

17  to JOHNSON & JOHNSON's benefit. (JANSSEN PHARMACEUTICALS, INC., ORTHO-

18  MCNEIL-JANSSEN PHARMACEUTICALS, INC., JANSSEN PHARMACEUTICA, INC.,

19  AND JOHNSON & JOHNSON collectively are referred to herein as "Janssen.")

20      57.    Defendant ENDO HEALTH SOLUTIONS INC., is a Delaware corporation with

21  its principal place of business located in Malvern, Pennsylvania. ENDO PHARMACEUTICALS,

22  INC., is a wholly-owned subsidiary of Endo Health Solutions Inc., and is a Delaware corporation

23  with its principal place of business in Malvern, Pennsylvania. (Endo Health Solutions Inc., and

24  Endo Pharmaceuticals, Inc., collectively are referred to herein as "Endo.").

25      58.    Defendant ALLERGAN PLC is a public limited company incorporated in Ireland

26  with its principal place of business in Dublin, Ireland formerly known as ACTAVIS PLC. Prior

27  to that, WATSON PHARMACEUTICALS, INC., acquired ACTAVIS, INC. in October 2012;

28  the combined company changed its name to ACTAVIS, INC., in January 2013 and then to

ACTAVIS PLC in October 2013.

1      59.     Defendant WATSON LABORATORIES, INC. is, and was at all times relevant

2  herein, a Nevada corporation with its principal place of business in Corona, California, and is a

3  wholly owned subsidiary of ALLERGAN PLC (f/k/a ACTAVIS, INC., f/k/a WATSON

4  PHARMACEUTICALS, INC.).  At all times relevant herein, Watson Laboratories, Inc. takes and

5  took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own,

6  maintain and defend drug patents. ACTAVIS PHARMA, INC. (f/k/a ACTAVIS, INC.), is a

7  Delaware corporation with its principal place of business in New Jersey, and was formerly known

8  as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its

9  principal place of business in Parsippany, New Jersey.

10      60.     Defendant INSYS THERAPEUTICS, INC., is, and was at all times relevant herein,

11  a Delaware corporation with its principal place of business located in Chandler, Arizona.  At all

12  times relevant herein, Defendant INSYS THERAPEUTICS, INC. was in the business of

13  designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling and/or

14  distributing Subsys, a transmucosal immediate-release formulation of fentanyl, packed in a single-

15  dose spray device intended for oral sublingual administration, and has done so to and within in

16  the State of Nevada. At all times relevant herein, INSYS THERAPEUTICS, INC. hired "Detailers"

17  in Washoe County, Nevada to make personal contact with physicians and clinics to advocate for

18  the purchase and use of opioid medications which were contrary to known safety concerns and

19  sound medical advice.   At all times relevant herein, INSYS THERAPEUTICS, INC., used

20  deceptive tactics to gain authorization for Subsys prescriptions from health insurance providers

21  for off-label, high dosage uses.

22      61.     Defendant MALLINCKRODT LLC is a Delaware corporation with its principal

23  place of business in Hazelwood, Missouri. Defendant MALLINCKRODT BRAND

24  PHARMACEUTICALS INC. is a Delaware corporation with its principal place of business in

25  Hazelwood, Missouri. Defendant MALLINCKRODT US HOLDINGS, INC. is a Nevada

26  corporation with its principal place of business in Hazelwood, Missouri.  At all times relevant

27  herein, Mallinckrodt US Holdings, Inc. takes and took advantage of legislative, regulatory and

28  tax schemes in Nevada for the purpose of holding, protecting and defending Mallinckrodt assets

related to their pharmaceutical business.

62. Defendants Mallinckrodt LLC, Mallinckrodt Brand Pharmaceuticals Inc., and Mallinckrodt US Holdings, Inc. (collectively "MALLINCKRODT") operate in the United States under the name Mallinckrodt Pharmaceuticals, with its United States headquarters located in Hazelwood, Missouri. At all times relevant herein, Defendant MALLINCKRODT was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and/or distributing opioid products known as Exalgo, Roxicodone, and Xartemis XR, and has done so to and within the State of Nevada.

63. That at all times relevant herein, PURDUE PHARMA, L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC. dba THE PURDUE FREDERICK COMPANY, INC.; PURDUE PHARMACEUTICALS, L.P.; ABBVIE INC.; ABBVIE USA LLC; DEPOMED, INC.; DAIICHI SANKYO, INC.; TEVA PHARMACEUTICALS USA, INC.; TEVA PHARMACEUTICALS INDUSTRIES LTD; CEPHALON, INC.; JOHNSON & JOHNSON; JANSSEN PHARMACEUTICALS, INC.; JANSSEN PHARMACEUTICA, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; ALLERGAN PLC f/k/a ACTAVIS PLC; ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC., INSYS THERAPEUTICS, INC.; MALLINCKRODT, LLC; MALLINCKRODT BRAND PHARMACEUTICALS INC.; and MALLINCKRODT US HOLDINGS, INC., (collectively "Defendant Manufacturers" or "Defendants") were, and currently are, regularly engaged in business in Washoe County. More specifically, Defendants were, and currently are, in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, and/or selling opioids throughout Washoe County.

**C. Defendants, Wholesale Distributors.**

64. Defendant, AMERISOURCEBERGEN DRUG CORPORATION, is, and at all times pertinent hereto, was, a foreign corporation authorized to do business in the County of Washoe, State of Nevada. Upon information and belief, and at all times relevant hereto,

14

1  AMERISOURCEBERGEN DRUG CORPORATION's principal place of business is located in
2  Chesterbrook, Pennsylvania, operating distribution centers in Ohio.

3       65.    Defendant, CARDINAL HEALTH, INC. is, and at all times pertinent hereto, was,
4  a foreign corporation with multiple wholly-owned subsidiaries incorporated under the laws of the
5  State of Nevada and/or authorized to do business in said state, and conducting business in the
6  County of Washoe, State of Nevada.

7       66.    Upon information and belief, and at all times relevant hereto, CARDINAL
8  HEALTH, INC.'s principal office is located in Dublin, Ohio, operating distribution centers in
9  Ohio. CARDINAL HEALTH 6 INC. is a Nevada Domestic Corporation. CARDINAL HEALTH
10  TECHNOLOGIES LLC is a Nevada Domestic LLC.  At all times relevant herein, CARDINAL
11  HEALTH TECHNOLOGIES LLC takes and took advantage of the legislative, regulatory and tax
12  schemes of the State of Nevada to own, maintain and defend patents, including those relating to
13  drug labeling, coding and distribution.

14       67.    CARDINAL HEALTH 108 LLC d/b/a Metro Medical Supply is a foreign limited
15  liability company incorporated under the laws of the state of Delaware and headquartered in
16  Dublin, Ohio, and registered and authorized to conduct business within the State of Nevada.
17  CARDINAL HEALTH 108 LLC d/b/a Metro Medical Supply operates a drug distribution center
18  within the physical confines of the Washoe County, specifically at 6640 Echo Ave, Ste J, Reno,
19  Nevada 89506.

20       68.    Defendant, McKESSON CORPORATION, is, and at all times pertinent hereto,
21  was, foreign corporation authorized to do business in the County of Washoe, State of Nevada.
22  Upon information and belief, and at all times relevant hereto, McKESSON CORPORATION's
23  principal place of business is located in San Francisco, California, operating distribution centers
24  in Ohio.  At all times relevant herein, McKESSON CORPORATION takes and took advantage
25  of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend
26  patents, including those relating to drug labeling, coding and distribution.

27       69.    AMERISOURCEBERGEN DRUG CORPORATION, CARDINAL HEALTH,
28  INC., CARDINAL HEALTH 6 INC.; and CARDINAL HEALTH TECHNOLOGIES LLC;
   (collectively "Defendant Distributors" or "Defendants") distributed opioids or facilitated the

15

1   distribution of opioids into Reno.  The United States Drug Enforcement Administration has found

2   it necessary to levy disciplinary action against these and each of these including large fines and

3   suspension or permanent cancellation of their licenses for distribution of controlled substances,

4   based on dangerous and abusive distribution practices as detailed herein and below.

5          70.     Defendant Distributors purchased opioids from manufacturers, including the

6   named Defendants herein, and distributed them to pharmacies throughout Reno, and the State of

7   Nevada.

8          71.     Defendant Distributors played an integral role in the chain of opioids being

9   distributed throughout Reno, and the State of Nevada.

10         **D. Defendants, Detailers.**

11         72.     Defendants AIDA B MAXSAM; ALLISON FOSTER; and JAMES KUMLE;

12   (hereinafter "Detailers") are natural persons who are, and at all relevant times herein were,

13   residents of Washoe County, Nevada, who are or were engaged in specialty drug sales on behalf

14   of Defendant Manufacturers and Distributors PURDUE; DAIICHI SANKYO, INC.; and/or

15   DEPOMED.

16         73.     Defendant Detailers were trained to, and did in fact, make personal contact with

17   physicians and clinics within Washoe County, Nevada for the purpose, and with the result, of

18   encouraging them to prescribe opioid medications in a manner inconsistent with known safety

19   concerns and contrary to sound medical practice.

20         **E. Defendants, Pharmacies.**

21         74.     Defendant pharmacies (collectively "Defendant Pharmacies" or "Defendants")

22   sold opioids to residents of Reno giving rise to the opioid crisis.

23         75.     Upon information and belief, Defendant Pharmacies played an integral role in the

24   chain of opioids being sold throughout Reno.

25         76.     That the true names and the capacities, whether individual, agency, corporate,

26   associate or otherwise, of Defendant Pharmacies, are unknown to Plaintiff. Plaintiff will ask leave

27   of the Court to amend this Complaint to show the true names and capacities of these Defendants,

28   when they become known to Plaintiff.

16

**F. Defendants, Health Care Providers**

77.     Defendant ROBERT GENE RAND, M.D. is, and was at all times relevant herein, a resident of Washoe County, Nevada and was a licensed medical doctor in the State of Nevada. Upon information and belief, and at all times relevant hereto, Defendant ROBERT GENE RAND, M.D., conducted business and provided medical services as RAND FAMILY CARE, LLC, a Nevada Domestic Limited Liability Company in Gardnerville, Nevada.

78.     Defendants ROBERT GENE RAND, M.D. AND RAND FAMILY CARE, LLC (collectively "Defendant Providers" or "RAND") diverted and distributed addictive and potentially lethal opioid medications, including, but not limited to, OxyContin, to residents of Washoe County, Nevada (including the City of Reno), operating a "pill mill" out of a local car dealership.

79.     Defendant RAND prescribed an excessive amount of opioid medication in reckless regard for his patients' lives.  For example, Defendant RAND prescribed approximately 23,645 pills of opioid medication to a single patient.[2] Unfortunately, this was not an isolated incident.

80.     Defendant RAND was investigated by the Board of Medical Examiners ("BME or Board"). The Board discovered that Defendant RAND constantly, and on a regular basis, over-prescribed opioid medication to his patients, increased opioid medication doses to patients without appropriate medical examinations, and on a regular basis prescribed additional opioid medication to patients who, due to one reason or another, needed extra medication.[3]

81.     On November 20, 2018, Defendant RAND and several of his associates, and/or individuals under his employment, pleaded guilty to various criminal counts in the United States

---

[2] UNITED STATES ATTORNEY'S OFFICE, DISTRICT OF NEVADA, *Reno Doctor Sentenced To 10 Years In Prison For Involuntary Manslaughter Of Patient And Unlawful Distribution Of Large Quantities Of Prescription Drugs* (November 20, 2017), *available at* http:// www.justice.gov/usao-nv/pr/reno-doctor-sentenced-10-years-prison-involuntary-maslaughter-patient-and-unlawful (last visited on 2018-08-22).
[3] *In the Matter of Charges and Complaint Against Robert Rand, M.D.*, No. 17-25704-1 (February 02, 2017), *available at* http://www.medboard.nv.gov/Resources/Public/2017_Public_Filings/ (last visited on 2018-08-22).

District Court, District of Nevada for their involvement in illegal activities. Defendant RAND was sentenced to ten (10) years in prison.[4]

82.     Defendant RAND was able to over-prescribe copious amounts of opioid medication due to the abundant supply from Defendant Manufacturers and Defendant Distributors.

**G.  Defendants, Does, Roes and Zoes.**

83.     That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant DOES 1 through 100, inclusive, are unknown to Plaintiff. Plaintiff will ask leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiff. Plaintiff believes each Defendant named as DOE was responsible for the misconduct alleged herein.

84.     That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant ROE CORPORATIONS 1 through 100, are unknown to Plaintiff. These Defendants include the manufacturer(s), distributor(s) and any third party that may have developed, manufactured, produced, sold, altered or otherwise distributed the subject drug, which caused Plaintiff's injuries as complained herein. Plaintiff will ask leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiff. Plaintiff believes each Defendant named as ROE CORPORATION was responsible for contributing to the misconduct alleged herein.

85.     That the true names and the capacities, whether individual, agency, corporate, associate or otherwise, of Defendant ZOE PHARMACIES 1 through 100, are unknown to Plaintiff. These Defendants include the pharmacies or similarly situated retailers that may have developed, manufactured, produced, sold, altered or otherwise distributed opioids which caused Plaintiff's injuries as complained herein. Plaintiff will ask leave of the Court to amend this Complaint to show the true names and capacities of these Defendants, when they become known to Plaintiff. Plaintiff believes each Defendant named as ZOE PHARMACY was responsible for contributing to the misconduct alleged herein.

---

[4] *Reno Doctor Sentenced To 10 Years In Prison For Involuntary Manslaughter Of Patient And Unlawful Distribution Of Large Quantities Of Prescription Drugs, supra* note 2.

86.     That Plaintiff is informed and believes, and based upon such information and belief, alleges that each of the Defendants herein designated as DOES, ROES and/or ZOES are in some manner responsible for the misconduct alleged herein.

87.     Plaintiff is informed and believes and thereon alleges that at all relevant times herein mentioned Defendants, and each of them, were the agents and/or servants and/or partners and/or joint venture partners and/or employers and/or employees and/or contractors of the remaining Defendants and were acting within the course and scope of such agency, employment, partnership, contract or joint venture and with the knowledge and consent of the remaining Defendants at the time of the event leading to the misconduct alleged herein.

**H. Jurisdiction & Venue.**

88.     That exercise of the jurisdiction by this Court over each and every Defendant in this action is appropriate because each and every Defendant has done, and continues to do, business in the State of Nevada, and committed a tort in the State of Nevada. Additionally, this Court has jurisdiction over the claims alleged herein as they arise under Nevada statutes and Nevada common law.

89.     Venue is proper in the Second Judicial District Court of Washoe County, Nevada where part of the claims alleged herein occurred.

## GENERAL FACTUAL ALLEGATIONS

**A. Opioids Generally**

90.     Defendants design, manufacture, distribute, sell, market, and advertise prescription opioids, including brand-name drugs like Oxycontin and Subsys, and generics like oxycodone, which are powerful narcotic painkillers. Historically, because they were considered too addictive and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat short-term acute pain cancer patients or for palliative (end-of-life) care.

91.     Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, coupled with evidence of greater pain complaints as patients developed tolerance to opioids over time and the serious risk of addiction and other side effects, the use of

1 opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not

2 prescribe opioids for chronic pain.

3      92.    In the 1970s and 1980s, studies were conducted that made clear the reasons to

4 avoid opioids. By way of example, the World Health Organization ("WHO") in 1986 published

5 an "analgesic ladder" for the treatment of cancer pain. The WHO recommended treatment with

6 over-the-counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs

7 ("NSAIDs") first, then use of unscheduled or combination opioids, and then stronger (Schedule

8 II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain,

9 and did not contemplate the use of narcotic opioids for chronic pain - because the use of opioids

10 for chronic pain was not considered appropriate medical practice at the time.

11      93.    Due to concerns about their addictive qualities, opioids have been regulated as

12 controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The

13 labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious,

14 life-threatening, or fatal respiratory depression," as a result of an excessive dose.

15     **B. Defendants' Fraudulent Marketing**

16      94.    To take advantage of the lucrative market for chronic pain patients, Defendants

17 developed a well-funded marketing scheme based on deception. Defendants used both direct

18 marketing and unbranded advertising disseminated by purported independent third parties to

19 spread false and deceptive statements about the risks and benefits of long-term opioid use.

20      95.    Yet these statements were not only unsupported by or contrary to the scientific

21 evidence, they were also contrary to pronouncements by and guidance from federal agencies such

22 as the Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention

23 ("CDC") based on that evidence. They also targeted susceptible prescribers and vulnerable patient

24 populations, including the elderly and veterans.

25      96.    Defendants also used kickback systems, prior authorization systems, and

26 incentives to encourage health care providers to prescribe the opioid medications.

27     ***Direct Marketing Efforts***

28      97.    Defendants' direct marketing of opioids generally proceeded on two tracks. First,

Defendants conducted, and continue to conduct, promotional campaigns extolling the purported

benefits of their branded drugs.  Advertisements were branded to deceptively portray the benefits of opioids for chronic pain.  For instance, Defendant Purdue commissioned series of ads in medical journals, called "Pain vignettes," for Oxycontin in 2012.  These ads featured chronic pain patients and recommended opioids for each.  One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that Oxycontin would help the writer work more effectively.  Purdue agreed in late 2015 and 2016 to halt these misleading representations in New York, but no similar order has been issued in Nevada. Defendant Mallinckrodt marketed its products, Exalgo and Xartemis as specially formulated to reduce abuse and published information on its website minimizing addition risk as well as advocating access to opioids. Defendant Insys provided health care providers with false and misleading information in order to deceive such providers into believing the FDA had approved Subsys for more uses than the FDA had actually approved.

98.     Second, Defendants promoted, and continue to promote, the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs.  Defendants' detailing to doctors is effective. By establishing close relationships with prescribing physicians, Defendants' sales representatives are able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to address individual prescribers' concerns about prescribing opioids for chronic pain.

99.     These direct techniques were also accompanied by kickbacks, prior authorization systems, and the use of other incentives to encourage health care providers, to prescribe the opioid medication for chronic pain.

100.     Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence.  Defendants devoted, and continue to devote, massive resources to direct sales contacts with doctors.

101.     Defendants paid sham "speaker fees" to doctors to run educational events to discuss the use of their products, but the fees were actually intended to reward those doctors for prescribing Defendants' products and incentivize them to prescribe more of those products to patients. In fact, often times the speakers spoke at events with minimal to no attendance simply

21

1   to collect the fee. These kickbacks increased as the number of prescriptions written by the
2   speakers increased.

3       102.    Upon information and belief and at all times relevant herein, Defendants ensured,
4   and continue to ensure, marketing consistency nationwide through national and regional sales
5   representative training; national training of local medical liaisons, the company employees who
6   respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker
7   slide decks, and sales training materials; and nationally coordinated advertising.   Upon
8   information and belief, Defendants' sales representatives and physician speakers were required
9   to adhere to prescribed talking points, sales messages, and slide decks, and supervisors rode along
10   with them periodically to both check on their performance and compliance.

11       103.    Upon information and belief and at all times relevant herein, Defendants employed,
12   and continue to employ, the same marketing plans and strategies and deployed the same messages
13   in Nevada as they did nationwide.

14       104.    As the opioid epidemic spread, many health care providers recognized the dangers
15   of opioid medication, including health risks and the risk of addiction.  Others, however, continued
16   to prescribe such medication for off-label purposes without adequately warning patients of the
17   dangers associated with opioids.

18       105.    Upon information and belief, Defendant Providers received financial incentives to
19   continue writing prescriptions for such opioid medication despite the dangers associated with
20   same.

21       106.    Across the pharmaceutical industry, "core message" development is funded and
22   overseen on a national basis by corporate headquarters. This comprehensive approach ensures
23   that Defendants' messages are accurately and consistently delivered across marketing channels –
24   including detailing visits, speaker events, and advertising – and in each sales territory. Defendants
25   consider this high level of coordination and uniformity crucial to successfully marketing their
26   drugs.

27       ***Unbranded/Third-Party Marketing by Defendants***

28       107.    In addition to direct communications, Defendants utilized third-party marketing to
promote their line of prescription opiates.  This "unbranded" marketing refers not to a specific

1    drug, but more generally to a disease state or treatment.  For instance, these marketing materials

2    generally promoted opioid use but did not name a specific opioid.  Through these unbranded

3    materials, Defendants presented information and instructions concerning opioids that were

4    generally contrary to, or at best, inconsistent with, information and instructions listed on

5    Defendants' branded marketing materials and drug labels and with Defendants' own knowledge

6    of the risks, benefits and advantages of opioids. An example of such unbranded marketing

7    techniques is Defendant Mallinckrodt's Collaborating and Acting Responsible to Ensure Safety

8    (C.A.R.E.S.) Alliance, which promoted a book "Defeat Chronic Pain Now!" minimizing the risk

9    of opioid addiction and emphasizing opioid therapy for regular use for moderate chronic pain.

10          108.    Using "Key Opinion Leaders" (KOLs) and "Front Groups," Defendants

11   disseminated their false and misleading statements regarding the efficacy of opioids. These KOLs

12   and Front Groups were important elements of Defendants' marketing plans, because they

13   appeared independent and therefore outside of FDA oversight.  However, Defendants did so

14   knowing that unbranded materials typically were not submitted or reviewed by the FDA.  By

15   acting through third parties, Defendants were able both to avoid FDA scrutiny and to give the

16   false appearance that these messages reflected the views of independent third parties. Afterwards,

17   Defendants would cite to these sources as corroboration of their own statements.

18          109.    Defendants worked, and continue to work, in concert with the Front Groups and

19   KOLs which they funded and directed to carry out a common scheme to deceptively market the

20   risks, benefits, and superiority of opioids to treat chronic pain.  Although participants knew this

21   information was false and misleading, these misstatements were nevertheless disseminated to

22   Nevada prescribers and patients.

23          ***Key Opinion Leaders (KOLs)***

24          110.    Upon information and belief and at all times relevant herein, Defendants recruited,

25   as part of its unbranded marketing efforts, a cadre of doctors who were financially sponsored

26   because of their preference to aggressively treat chronic pain with opioids.  KOLs were retained

27   by Defendants to influence their peers' medical practice, including but not limited to their

28   prescribing behavior.  KOLs gave lectures, conducted clinical trials and occasionally made

1  presentations at regulatory meetings or hearings. KOLs were carefully vetted to ensure that they
2  were likely to remain on message and supportive of Defendant' agenda.

3      111.   Defendants' financial support helped these doctors become respected industry
4  experts. Upon information and belief, these doctors repaid Defendants by extolling the benefits
5  of opioids to treat chronic pain as quid pro quo. Defendants would cite to these sources later on
6  as corroboration of their own false and misleading statements regarding opioids.

7      ***Front Groups***

8      112.   Defendants also entered into arrangements with seemingly unbiased and
9  independent patient and professional organizations to promote opioids for the treatment of chronic
10  pain. Under their direction and control, these "Front Groups" generated treatment guidelines,
11  unbranded materials, and programs that favored chronic opioid therapy. They also assisted
12  Defendants by refuting negative articles, by advocating against regulatory changes that would
13  limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach
14  to vulnerable patient populations targeted by Defendants.

15      113.   These Front Groups depended on Defendants for funding and, in some cases, for
16  survival. Defendants exercised significant control over programs and materials created by these
17  groups by collaborating on, editing, and approving their content, and by funding their
18  dissemination. In so doing, Defendants made sure that these Front Groups would generate only
19  favorable messages. Despite this, the Front Groups held themselves out as independent and
20  serving the needs of their members – whether patients suffering from pain or doctors treating
21  those patients.

22      114.   While Defendants utilized many Front Groups, one of the most prominent of was
23  the American Pain Foundation ("APF"). APF received more than $10 million in funding from
24  opioid manufacturers from 2007 until it closed its doors in May 2012. Upon information and
25  belief, Defendant Purdue was one of its primary financial backers.

26      115.   APF issued education guides for patients, reporters, and policymakers that touted
27  the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.
28  APF also launched a campaign to promote opioids for returning veterans, which has contributed
    to high rates of addiction and other adverse outcomes – including death – among returning soldiers.

1  APF also engaged in a significant multimedia campaign – through radio, television and the

2  internet – to educate patients about their "right" to pain treatment, namely opioids. All of the

3  programs and materials were available nationally and were intended to reach Nevadans.

4       116.    In or about May 2012, the U.S. Senate Finance Committee began investigating

5  APF to determine the relationship, financial and otherwise, between the organization and the

6  manufacturers of opioid analgesics.  The investigation caused considerable damage to APF's

7  credibility as an objective and neutral third party, and Purdue, upon information and belief,

8  stopped financially supporting the organization.

9       117.    Within days of being targeted by Senate investigation, APF's board voted to

10  dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist,

11  effective immediately."

12       ***Continuing Medical Education (CMEs)***

13       118.    CMEs are ongoing professional education programs required for physicians.

14  Physicians must attend a certain number and, often, type of CME programs each year as a

15  condition of their licensure.  These programs are delivered in person, often in connection with

16  professional organizations' conferences, and online, or through written publications. Doctors rely

17  on CMEs not only to satisfy licensing requirements, but to get information on new developments

18  in medicine or to deepen their knowledge in specific areas of practice. Because CMEs are

19  typically delivered by KOLs who are highly-respected in their fields and are thought to reflect

20  their medical expertise, they can be especially influential with doctors.

21       119.    By utilizing CMEs, Defendants sought to reach general practitioners, whose broad

22  area of focus and lack of specialized training in pain management made them particularly

23  dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.

24  Defendants sponsored CMEs promoted chronic opioid therapy.

25       120.    These CMEs, while often generically titled to relate to the treatment of chronic

26  pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids,

27  and frequently omitted or downplayed their risks and adverse effects.

28       121.    Upon information and belief and at all times relevant herein, CMEs paid for or

sponsored by Defendants were intended to reach prescribing physicians in Nevada.

25

***Drug Manufacturer Defendants—Kickbacks to Encourage Prescriptions***

122.    Upon information and belief, Defendants utilized a system of kickbacks to encourage health care providers to write prescriptions for, and deliver, the opioid medications. Kickbacks took the form of "speaker fees" paid to health care providers that spoke at programs regarding the purported benefits and safety of using opioid medications to treat chronic pain. Such speakers were recruited by Defendants based upon the number of prescriptions the providers wrote for opioid medications. The more prescriptions written, the more times the speaker was asked to appear at a program, and the more "speaker fees" were paid to the provider. Defendants' employees were rewarded when their "speakers" increased the prescriptions they wrote. These speaking programs did not result in other health care providers writing a significant number of prescriptions for Defendants' products, but the "speakers" continued to be paid to speak so long as they increased their own prescriptions. Many of the speaker programs had few or no attendees that would actually be able to write prescriptions for Defendants' products. Upon information and belief, Defendant Providers, benefitted from such programs.

***Prior Authorization Programs***

123.    Upon information and belief, Defendants developed prior authorization programs in order to gain authorization and approval from insurance companies to cover the costly opioid products for off-label uses. These programs involved representatives from Defendants contacting insurance companies and representing that they are from a health care provider's office rather than from the Defendant manufacturer or distributor; providing inaccurate diagnosis information on the authorization requests; and drafting Letters of Medical Necessity for health care providers to sign-off on for purposes of receiving authorization from health insurance providers. Upon information and belief, Defendant Providers also participated in misleading the health insurance providers to authorize the numerous prescriptions written for opioid medications, including, but not limited to, Subsys.

***Medication Switch Programs***

124.    Upon information and belief, Defendants encouraged and incentivized detailers and sales people to convince health care providers to substitute stronger, more expensive opioid medications for medications that patients were already prescribed. Detailers and sales people were

26